IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ARTHUR C. WAGNER, JR., individually | ) | |
| and for the benefit of his wife, | ) | |
| Jean Marie Wagner, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 05-2336-JPO |
| | ) | |
| SFX MOTOR SPORTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I.  Introduction

This is a personal injury case which arises out of a crash during a commercially sponsored motorcycle road race.  Following five days of trial, the jury returned a verdict in favor of the plaintiff, Arthur C. Wagner, Jr., finding wanton conduct by the race sponsor-promoter, defendant SFX Motor Sports, Inc. ("SFX"), and awarding nearly $2.6 million in compensatory damages (doc. 150).  The jury rejected plaintiff's wanton conduct claims against the track's owner-operator, defendant Heartland Park Raceway, L.L.C. ("Heartland Park").

With judgment having been entered based on the jury's verdict (*see* doc. 154), the case now comes before the court on SFX's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial (**doc. 157**).  Also before the court is SFX's separate

motion to alter or amend the judgment (**doc. 159**).  These motions have been extensively briefed (*see* docs. 158, 160-65, & 169).

For the reasons explained below, the court denies SFX's motion for judgment as a matter of law or, in the alternative, for a new trial.  SFX's motion to alter or amend the judgment is granted in part and denied in part, i.e., the judgment must be reduced by approximately $1 million in accordance with K.S.A. § 60-19a02, the Kansas statute that imposes a $250,000 "cap" on jury awards of noneconomic damages.

## II.  Background and Uncontroverted Facts

On August 8, 2003, plaintiff was injured as a result of a motorcycle crash while competing in the "Formula USA 250K Team Challenge Endurance Race" at the Heartland Park racetrack in Topeka, Kansas.  The track is owned by the City of Topeka, but the City assigned its rights to operate the track to Jayhawk Racing Properties, L.L.C. ("Jayhawk"), which in turn assigned its rights to Heartland Park.

On March 1, 2003, Heartland Park and SFX entered into a track rental agreement. This agreement authorized SFX to stage Formula USA Series and Championship Cup Series motorcycle races at the track from August 8 through 10, 2003.

During a race competition on August 8, 2003, plaintiff's motorcycle slid off the 2.5 mile track at what is known as Corner 10.  Plaintiff crossed the grass and dirt "run-off" area outside Corner 10 and collided with an unprotected portion of a concrete barrier.  The collision ignited a fire which engulfed both plaintiff and the motorcycle.  Plaintiff suffered severe injuries.

During this particular race, SFX placed corner workers in various stations along the track.  They acted as flaggers to inform racers to proceed with caution or stop altogether in the event of an accident.  They also served as emergency responders by helping downed racers if necessary.  At the time of plaintiff's accident, the two corner workers assigned to Corner 10 were Randy Bodtke and his wife, Linda Bodtke, both of whom had been hired by SFX through a temporary employment services agency.

On August 2, 2005, plaintiff filed suit in this federal court against SFX, Heartland Park, and Jayhawk, as well as SFX Entertainment, Inc. d/b/a Clear Channel Entertainment ("SFX Entertainment") and Clear Channel Communications, Inc. ("Clear Channel").[1] Plaintiff's complaint pleaded negligence and wanton conduct as his alternative theories of recovery.  On October 27, 2006, after discovery had been completed, the presiding U.S. District Judge, Hon. Kathryn H. Vratil, granted partial summary judgment in favor of SFX and Heartland Park on plaintiff's ordinary negligence claims, based on a pre-race release executed by plaintiff and each of his fellow competitors (doc. 66).  Judge Vratil also granted summary judgment as to *all* of plaintiff's claims against Jayhawk, SFX Entertainment, and Clear Channel, finding there was no basis for liability of any of these defendants.  As a result, SFX and Heartland Park were the only two defendants at trial, with wanton conduct being the sole theory of recovery.

---

[1] Plaintiff resides in New York.  The court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  Pretrial order (doc. 62 at ¶ 3(a)).

On January 5, 2007, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties

consented to the disposition of this case by the undersigned U.S. Magistrate Judge, James P.

O'Hara (*see* doc. 73).  At trial, which began on July 30, 2007, plaintiff claimed his injuries

resulted from SFX's and Heartland Park's wanton failure to provide proper protection to race

participants.  As earlier indicated, the jury returned a defense verdict for Heartland Park (the

track's owner-operator) and a verdict for plaintiff against SFX (the race sponsor-promoter).

III.   SFX's Renewed Motion for Judgment as a Matter of Law

A.     Procedural Standards

A post-trial motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b)

is appropriate only if the evidence, viewed in a light most favorable to the nonmoving party,

"points but one way and is susceptible to no reasonable inferences supporting the party

opposing the motion."[2]  Such motions should be "cautiously and sparingly granted."[3]  In

determining whether judgment as a matter of law is proper, the court may not weigh the

evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.[4]

Rather, the court must affirm the jury verdict if, viewing the record in a light most favorable

to the nonmoving party, it contains evidence upon which the jury could have properly

---

[2] *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002) (quoting *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232. 1241 (10th Cir. 1991))

[3] *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2007) (quoting *Neese v. Schuckman*, 98 F.3d 542, 548 (10th Cir. 1996)).

[4] *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001) (citing *Lockard v. Pizza Hut*, 162 F.3d 1062, 1068 (10th Cir. 1998)).

returned a verdict for the nonmoving party.[5]  Conversely, though, the court must enter judgment as a matter of law for the movant if "'there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.'"[6]

B.    Sufficiency of the Evidence

SFX argues plaintiff's claim that SFX acted with wanton disregard of a known or obvious risk of harm at Corner 10 is simply not supported by the evidence in this case.  In reviewing and discussing the evidence, SFX consistently construes the record in favor of SFX instead of plaintiff.  Although perhaps understandable, this ultimately is fatal to SFX's motion.

As set forth in Jury Instruction No. 15 (doc. 135 at 18-19), which was patterned after Judge Vratil's very detailed and well-reasoned memorandum and order ruling on the defendants' motion for summary judgment (doc. 66), under Kansas law wanton conduct is a product of a defendant's mental attitude.[7]  To establish wanton conduct, a plaintiff must show the defendant's realization of the imminence of danger and a reckless disregard, complete indifference, or lack of concern for the probable consequences of the wrongful act.[8]

---

[5] *Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219-20 (10th Cir. 1999) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996)).

[6] *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quoting *Harolds*, 82 F.3d at 1546-47).

[7] *Robison v. State*, 30 Kan. App. 2d 476, 479, 43 P.3d 821, 824 (2002).

[8] *Lanning v. Anderson*, 22 Kan. App. 2d 474, 479, 921 P.2d 813, 818 (1996) (quoting *Boaldin v. Univ. of Kan.*, 242 Kan. 288, 293, 747 P.2d 811, 814 (1987)).

The defendant's realization of an imminent danger may be established with circumstantial evidence that (1) the defendant had reason to believe such a danger existed, or (2) the defendant disregarded a known or obvious risk from which harm was likely to occur.[9]  Such evidence may be used to form a legitimate inference as to the requisite knowledge of the defendant.[10]

SFX's papers implicitly ignore that a defendant's reckless disregard or complete indifference need not include an intent to injure.[11]  That is, since reckless disregard and indifference are characterized by failure to act when action is called for to prevent injury, wanton conduct includes acts of omission as well as acts of commission.[12]  Preventative measures will preclude a finding of wantonness only where those measures "materially lessen the chances of the injury suffered by the plaintiff."[13]  The ultimate determination of whether conduct is wanton is generally a question of fact for the jury.[14]

As set forth in Jury Instruction No. 14 (doc. 135 at 15-17), and consistent with the material factual issues of the case as preserved in the final pretrial order (doc. 62 at ¶ 6(a)),

---

[9] *Id.* at 482, 921 P.2d at 819-20.

[10] *Id.*

[11] *Reeves v. Carlson*, 266 Kan. 310, 314, 969 P.2d 252, 256 (1998).

[12] *Gould v. Taco Bell*, 239 Kan. 564, 572, 722 P.2d 511, 518 (1986).

[13] *Wolfgang v. Mid-Am. Motorsports, Inc.*, 111 F.3d 1515, 1523 (10th Cir. 1997).

[14] *Gruhin v. City of Overland Park*, 17 Kan. App. 2d 388, 392, 836 P.2d 1222, 1225 (1992).

plaintiff alleged the following specific grounds for wanton conduct by SFX and Heartland Park:

a.      Defendants failed to provide a safe run-off area for foreseeable crashes.

b.      Defendants left unnecessary moveable concrete walls in the foreseeable run-off area.

c.      The concrete walls that were in the foreseeable run-off area, where plaintiff hit the wall, were not padded or protected with tires, hay bales, air fences,[15] or other safety devices.

d.      Defendants failed to properly train and equip corner workers or fire fighting personnel so they could quickly and effectively put out the fire that resulted from plaintiff's crash.

e.      Defendants failed to staff Corners 10 and 11 with adequate numbers of corner workers, and failed to have any corner workers on the outside of Corners 10 and 11 so they could quickly respond to an injured racer.

f.      Defendants' corner workers, fire fighting personnel, and medical personnel failed to put out the fire that engulfed plaintiff, such that the fire ceased burning on its own after running out of fuel.

---

[15] In the racing industry, an air fence is a protective device placed against a hardened barrier.  It operates much like an air bag in an automobile.

g.     The communications system between corner workers and the tower was inadequate, such that the race could be timely stopped as soon as the accident occurred.

SFX argues that none of these grounds are supported by the evidence in this case.

SFX initially asserts that the run-off area and barrier outside Corner 10 were not dangerous and that, in any event, Heartland Park, not SFX, had control over the placement of the barrier.  Further, SFX argues it did not subjectively consider the run-off area to be dangerous.  In this regard, SFX points to the testimony of former SFX manager Kenneth Abbott, and SFX's director of operations, Kevin Elliott.  Both Abbott and Elliott, and most of the competitive racers (including plaintiff), conducted pre-race test runs of the track and none of them reported the run-off area at Corner 10 as being unsafe.  Gordon Spieckerman, a safety officer for the Midwest Racing Association hired by SFX to monitor the corner workers and the track on the day of the race, as well as Bill Ritger, a race control supervisor for SFX, also conducted a pre-race inspection of the track, and neither identified Corner 10's run-off area as unsafe.

Abbott and Elliott testified they implemented safety barriers in all locations they felt were the primary target zones for impact, including a portion of the wall at Corner 10.  This testimony was confirmed by Spieckerman and Ritger.

SFX also heavily relies on the testimony of William Fehrman, a law enforcement officer who served as SFX's race director on August 8, 2008.  Fehrman testified that he had a great deal of racing experience, including intimate familiarity with Heartland Park, having

worked races there since the track opened in the late 1980s, and including several stints as race director since the early 1990s.  According to Fehrman, he never perceived the run-off area and barrier outside Corner 10 to present a significant safety hazzard, and had never received any complaints from racers or anyone else about that corner.

Plaintiff counters by arguing evidence was presented during trial showing that Corner 10 and its run-off area were dangerous, that SFX had reason to believe so, and that SFX disregarded the known or obvious risk from which harm was likely to occur.  Specifically, plaintiff points out that Randy Bodtke, a corner worker at Corner 10, testified that *several* motorcycles had run off the track at Corner 10 during practice runs on the day of the accident.  Further, plaintiff notes it is uncontroverted that the portion of the wall near Corner 10 where plaintiff impacted was unprotected, i.e., it was not lined with tires, hay bales, air fence, or other safety devices.  Plaintiff also notes that Raymond Irwin, the principal owner of Heartland Park, testified SFX could have instructed Heartland Park to remove the concrete barrier outside of Corner 10, or at least could have placed safety devices along the barriers there.  Irwin testified that, if SFX had required this action and stipulated it was a safety issue, Heartland Park would have done so.  Heartland Park had the equipment available to move the barriers.  Additional tires were also available that could have been used to protect against impact with the barrier at Corner 10 where plaintiff's accident occurred.  Plaintiff's retained expert witness on liability, Russell Darnell, also testified the concrete barrier outside of Corner 10 could have been removed and SFX could have padded the barriers with air fence or other devices.

As to the corner workers and other emergency personnel, SFX asserts that two corner workers were stationed at Corner 10 on the day of the accident and one of those corner workers, Randy Bodtke, was equipped with a fire extinguisher.  Mr. Bodtke testified he used the fire extinguisher to spray plaintiff's motorcycle and the corner worker from Corner 11 used his fire extinguisher to put out the fire on the ground around plaintiff after the accident. Spieckerman testified that he felt the corner workers were adequately trained and understood their responsibilities after their meeting on the day of the accident.  Spieckerman, Ritger, Elliott, and Fehrman testified they believed there were a sufficient number of corner workers at Heartland Park on the day of the accident.  Linda Bodtke, the other corner worker at Corner 10, testified she was equipped with a radio to communicate with the control tower and she did not have any communication problems on the day of the accident.

Plaintiff, however, counters by pointing out that Randy Bodtke was delayed in reaching plaintiff immediately after the accident.  Although the court believed a strong preponderance of the evidence showed SFX timely and appropriately responded to plaintiff's crash, there was some testimony by Mr. Bodtke that motorcycles continued racing after the accident and he had to wait for the last motorcycle to pass before he could safely cross the track to attend to plaintiff.  In this regard, it is important to note that even Abbott and Ritger conceded that the preferred arrangement is to have three workers at each corner - with two on the inside of the track, and one on the outside; this arrangement obviously would have allowed for a quicker response to plaintiff's plight.  On the day of plaintiff's accident, there

were only two corner workers stationed at Corner 10 and only one at Corner 11, and *none* of these individuals were positioned on the outside of the track where plaintiff crashed.

Laura Lee Jones, another racer, testified she was the first person to attend to plaintiff after the accident. According to Jones, SFX's emergency personnel, at least initially, did not attend to plaintiff. Jones and Billy Keener, a friend of the plaintiff and member of his pit crew, testified they did not see anyone using fire extinguishers at the scene of the accident. Keener stated that, although the corner workers were present at the scene, they did not attend to plaintiff.

Prior to the day of the accident, Randy Bodtke had no experience as a race corner worker. His wife, Linda Bodtke, had very limited experience as a corner worker and even that was twenty years prior on a much smaller track. As earlier indicted, both Mr. and Mrs. Bodtke were hired by SFX for the race from a temporary employment agency. Ritger and Spieckerman conceded that inexperienced corner workers should not be put together, but should be paired with an experienced corner worker.

Several witnesses testified corner workers are not to wave a red flag to stop the race without approval from the control tower. Linda Bodtke testified that enough time had passed between her initial radio notification to the control tower of the accident to her receiving authorization from the control tower to wave the red flag that the racers had gone all the way around the 2.5 mile track again. Keener testified he was timing plaintiff during the race and it took plaintiff approximately one minute and forty seconds to complete a lap.

During trial, the court denied the defendants' motion for judgment as a matter of law, but expressed reservations about the strength of plaintiff's wanton conduct claims. It should come as no surprise that, had this case been tried to the court sitting without a jury, there would not have been any finding of wanton conduct on the part of SFX. That is, the trial judge found the testimony of Abbott, Elliott, Spieckerman, Ritger, and Fehrman to be *exceptionally* credible and almost entirely favorable to SFX, in that all of these gentlemen are very experienced in motorcycle race operations and safety, and all seemed quite sincere in their efforts to stage the race as safely as possible, mindful that racing presents many inherent dangers. The court perceived the testimony of plaintiff's retained expert witness (Russell Darnell) to be pretty much of the "hired gun" variety, in that he claimed to be an expert not only on motorcycle racing but on a nearly endless number of topics. But of course this was not a bench trial. As earlier indicated, a trial judge does not have veto power over a jury which draws its own reasonable inferences from the trial record as a whole. Although SFX implicitly ignores this major point, the jury in this case was within its rights to believe little, or indeed, none of the sworn testimony of SFX's employees. The jury was within its prerogative to deem Darnell credible, even if the trial judge perceived him to be quite the opposite.

In reviewing the evidence as a whole as presented to the jury during trial in a light most favorable to plaintiff, and indulging plaintiff all of reasonable inferences that can be drawn from the trial record, the court finds plaintiff has met his evidentiary burden, although just barely so, to prove it is more probably true than not true that plaintiff sustained injuries

caused by SFX's wanton conduct.  Specifically, the court finds the testimony regarding the movability of the concrete barriers, the availability of padding, and the staffing of Corner 10 was sufficient for the jury to return a verdict in favor of plaintiff and against SFX.  The evidence was sufficient for the jury to reach the conclusion that SFX had reason to believe Corner 10 and its run-off area were dangerous, or the presence of the concrete barriers, lack of padding, or placement of inexperienced corner workers presented obvious risks, and SFX recklessly disregarded its realization of these dangers.

IV.  SFX's Alternative Motion for a New Trial[16]

A.    Procedural Standards

_____

[16] While the jury was deliberating, the defendants moved for a new trial or, in the alternative, a mistrial, based on the jury's request for and possible use of a ruler (doc. 136); without the trial judge's knowledge or permission, a bailiff had granted the jury's request for a ruler.  Presumably the jury wanted a ruler to measure certain distances as depicted on aerial photographs and diagrams of the track that were admitted into evidence, as there was a significant dispute by the parties as to how much run-off area was available at Corner 10.  The court allowed the parties to brief the issue and convened a hearing on the record to hear oral argument on their motion, of course outside the jury's presence (*see* docs. 136-38).  Ultimately, the undersigned deferred ruling on the issue, with the understanding it would be taken up only in the event that the jury returned a plaintiff's verdict.  After the jury returned its verdict against SFX, the above-described motion was orally renewed by SFX.  By agreement and order, the undersigned denied that motion, without prejudice to being reasserted in SFX's written post-trial motions (*see* doc. 152).  But SFX has not raised the issue in the pending post-trial motions.  Accordingly, the court considers this issue abandoned.

Motions for new trial are committed to the sound discretion of the trial court.[17] They are generally regarded with disfavor and should only be granted with great caution.[18]  A "party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence."[19]

### B.    Comparative Fault

SFX seeks a new trial based on the court's decision not to instruct the jury on comparative fault principles.  Of course, "[t]he decision whether to give or exclude a particular jury instruction is committed to the sound discretion of the trial court."[20]  "In reviewing jury instructions, the court must determine if the instructions properly state the law and provide the jury with ample understanding of the issues and the standards applicable."[21] "The instructions must cover the issues presented by the evidence and accurately state law."[22]

---

[17] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir. 1993).

[18] *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992).

[19] *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir. 1983).

[20] *Audiotext Commc'ns. Network, Inc. v. US Telecom, Inc.*, No. 94-2395, 1996 WL 568839, at *5 (D. Kan. Sept. 4, 1996) (citing *City of Wichita v. United States Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996)).

[21] *Crumpacker v. State*, No. 00-4044, 2004 WL 3186196, at *3 (D. Kan. Oct. 6, 2004) (citing *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir. 1988)); *see also Audiotext*, 1996 WL 568839, at *5 (citing *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1517 (10th Cir. 1995)).

[22] *Crumpacker*, 2004 WL 3186196, at *3 (citing *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir. 1992)).

"A new trial is warranted only when a failure to give an instruction is prejudicial in view of the entire record."[23]

Instead of defendants, it was plaintiff who initially raised the issue of comparative fault by way of a motion in limine (doc. 96), asking the court to preclude any reference during trial to the plaintiff's alleged comparative fault or assumption of risk. For the benefit of context, the court notes here its extensive discussion of this issue in the limine order, as follows:

> Plaintiff asserts that comparative fault principles, as a matter of law, do not apply to claims for wanton conduct. Defendants disagree.
>
> . . .
>
> Plaintiff cites the Tenth Circuit Court of Appeals' decision in *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515 (10th Cir. 1997) . . . for the unqualified proposition that Kansas comparative fault principles have zero application to claims for wanton conduct. In that case, which involved a race car crash, the Tenth Circuit held that the trial judge had not abused his discretion in excluding evidence of a pre-race release and the plaintiff's fault. *Id.* at 1527-28.
>
> *Wolfgang* seems quite similar to the instant case in that both involved commercially sponsored races in the State of Kansas where the plaintiff had executed a broad form release before the race. But the court respectfully disagrees with plaintiff that *Wolfgang* necessarily and absolutely precludes admission of all evidence of comparative fault in all cases where wanton conduct is the only claim presented to the jury at trial. Although the Tenth Circuit did state that "in a wantonness case, liability could only be negated if the plaintiff's actions were the

---

[23] *Id.* (citing *United States v. Martin*, 18 F.3d 1515, 1519 (10th Cir. 1994)).

sole cause of his injuries," it also pointed out that "a finding of wantonness requires consideration of all the facts and circumstances surrounding the crash." *Id.* (citing *State v. Betts*, 519 P.2d 655 (Kan. 1974); *Friesen v. Chicago, Rock Island & Pacific R.R.*, 524 P.2d 1141 (Kan. 1974)).   Further, it is extremely important to keep in mind that the plaintiff in the *Wolfgang* litigation had admitted that his accident was his fault. *Id.*  ("[T]he issue in the case was not the cause of his accident, but the cause of his extensive burns.").  In contrast, in the case at bar, while Mr. Wagner has indicated a willingness to stipulate that he lost control of his motorcycle and that led directly to the crash, the damages he seeks are much broader than those that were sought by Mr. Wolfgang.   The plaintiff in the present case seeks damages not only for the serious burns and injuries he claims he sustained due to defendants' alleged failure to timely aid him after the accident, but also for injuries he claims were due to the crash itself.  Accordingly, the court is inclined to find *Wolfgang* factually distinguishable, or at a minimum that plaintiff reads that case too broadly.

Highly summarized, plaintiff argues: (1) comparative fault principles apply only to the extent that contributory negligence would have been a viable defense to a claim before the Kansas comparative fault statute was enacted in 1974 (K.S.A. § 60-258a); (2) as a matter of law, ordinary negligence was not a viable defense to a claim for wanton conduct before the comparative fault statute went into effect; and (3) therefore, defendants in the case at bar cannot rely on plaintiff's alleged fault (which nobody suggests constitutes wanton conduct) as a basis to compare fault under K.S.A. § 60-258a.  This argument has some merit, but only goes so far.

Unfortunately, and all of the parties agree on this point, the Kansas statute regarding comparative negligence, K.S.A. § 60-258a, does not clearly articulate whether it applies to claims for wanton conduct.  Of course, allegedly wanton conduct in a Kansas tort case typically comes into play with the plaintiff pleading his claim in terms of ordinary negligence, with a separate request for an award of punitive damages based on the standard pattern jury instruction that refers to "willful, wanton, or malicious" conduct.  Here, though, because of the obvious

impediment presented by the release plaintiff signed before the race, the defendants' alleged wanton conduct is the predicate to plaintiff's theory of recovery, as opposed to a basis to seek punitive damages. Indeed, making this case even more atypical, plaintiff's counsel confirmed during the limine conference that they had made the strategic decision not to ask the jury for punitive damages, even if a verdict finding wanton conduct is secured.

The parties have provided some briefing (and extensive oral argument) on the issue of whether Kansas comparative fault principles apply in a situation such as presented in this case, where the *only* tort alleged is wanton conduct. But neither plaintiff nor defendants have cited any case that is directly on point.

Unfortunately, neither plaintiff nor defendants looked far enough down-field and timely filed a motion for partial summary judgment, which would have allowed this potentially pivotal issue to be developed in the context of a well-developed record instead of hastily prepared briefs on the eve of trial. And, the parties have declined to accept the undersigned trial judge's practical suggestion that they agree to have this issue certified to the Kansas Supreme Court before a time-consuming and expensive trial, which evidently will include many out-of-state witnesses and expensive retained experts.

Given the record as it now stands, the undersigned observes that, despite *Wolfgang*, there is considerable persuasive authority for the proposition that, barring a factual stipulation rendering the issue moot, comparative fault principles should be applied in any Kansas personal injury case that alleges less than intentional conduct. *See Wheeler v. Mo. Pac. R.R. Co.*, No. 88-1231, 1988 WL 142421, at *3 (D. Kan. Dec. 14, 1988) (holding that the Kansas comparative fault statute "encompasses all personal injury actions even if wanton conduct is alleged."). *See also Bowman v. Doherty*, 686 P.2d 112 (Kan. 1984) (in legal malpractice case involving evidence of wanton conduct, court applied comparative fault principles to determine actual damages, but not punitive damages); *Sandifer Motors, Inc. v. Roeland Park*, 628 P.2d 239, 248 (Kan. Ct. App. 1981) (flood

nuisance case, stating that "where tort liability is predicated on conduct less culpable than 'intentional,' the general rule is to compare fault and causation.").

Even though plaintiff raised the comparative fault dispute via his motion in limine, from a trial management perspective, it is noteworthy that plaintiff also argues that whether comparative fault principles apply to this case may be moot because supposedly there is no evidence showing that plaintiff was at fault at all.  In light of the sparse and conflicting case law presented thus far on point, and in light of plaintiff's optimistic forecast about the nature of the anticipated evidence, the court will exercise its discretion and deny plaintiff's motion in limine to exclude evidence of comparative fault.  But, the court intends to closely monitor and tightly rein any evidence proffered by defendants along the lines of comparative fault, particularly given that defense counsel have represented this evidence will be essentially confined to plaintiff's alleged failure to notice and then raise concerns about the safety of the barrier near Turn 10 of the track during his pre-competition runs.  Stated more directly, under the circumstances, it would seem that defendants need only refer to this once during opening statement, establish it a single time during plaintiff's cross-examination, and wrap things up with a short statement during closing argument – the court will *not* allow defendants to beat this drum endlessly.

The court intends to revisit this issue of comparative fault at the close of evidence and instruct the jury according to its determination at that time.  Should the court conclude at that juncture that comparative fault does not apply, either as a matter of law or due to a lack of competent supporting evidence, then the court would be strongly inclined to give an appropriate limiting and cautionary jury instruction.  Plaintiff is invited to propose such an instruction well in advance of the conference that will be held pursuant to Fed. R. Civ. P. 51.

Doc. 120 at 4-9 (footnotes omitted).

During the instructional conference that was conducted toward the end of trial in

accordance with Fed. R. Civ. P. 51, the court announced its decision to decline to instruct the

jury as to comparative fault in light of the lack of evidence showing plaintiff was at fault. Consistent with their pretrial position, the defendants again made brief reference to plaintiff's failure to complain about any allegedly unsafe conditions on the track after his pre-race practice run, and further that the evidence showed plaintiff took Corner 10 too fast and lost control of his motorcycle, thus causing the crash and his ensuing injuries.

Given the record presented, the court remains of the view that there was no showing of fault on the part of plaintiff.  Even though the boilerplate release form that plaintiff signed before the race purported to impose a duty to inspect on plaintiff, the court simply is unpersuaded that the mere failure by plaintiff to notify defendants their track was dangerously configured constitutes "fault" on his part for purposes of K.S.A. § 60-258a. And, as to going fast around Corner 10, that is precisely what competitive racers are expected to do and thus it is difficult to deem that fault within the meaning of the comparative fault statute.  This effectively renders moot the issue of whether comparative fault applies to cases involving claims for wanton conduct.  But in any event the court is now of the view it would have been improper, as a matter of law, to compare wanton conduct with conduct consisting, at most, of simple negligence.

Regardless, in terms of whether SFX suffered any prejudice, it is important to remember that the court instructed the jury in this case as follows:

> During this trial, you have heard evidence concerning the conduct of plaintiff and other racers in the race in which plaintiff participated.  You also have heard evidence about the agreement plaintiff signed before the race, setting forth the responsibility of racers to report safety hazards.  This evidence has been

> admitted by the court for a limited purpose.  That is, you may
> consider this evidence only as it may be relevant to plaintiff's
> claim that defendants acted wantonly.

Doc. 135, Instruction No. 16.  The court concludes it was not prejudicial error to refuse to instruct the jury as to comparative fault.  The above-described instruction was proper.  SFX is not entitled to a new trial on this basis.

C.      Wantonness v. Negligence

SFX also seeks a new trial on the basis that the court's preliminary and final instructions regarding wanton conduct were improper because they did not adequately distinguish claims for ordinary negligence from claims for wanton conduct.  As noted above, the court's wanton conduct instruction was closely patterned after Judge Vratil's memorandum and order granting in part the defendants' motion for summary judgment.[24] This instruction properly stated the law and provided the jury with ample understanding of the issues presented by the evidence and the applicable standards.  The decision to exclude instructions as to ordinary negligence, which all agree was not a claim by plaintiff that remained in the case at trial, was certainly within the court's discretion.  As stated during trial, to minimize potential jury confusion, the court simply chose to instruct the jury as to what this case is about, not as to what it is not about.  Therefore, the court finds its refusal to give SFX's proposed instruction on this basis does not constitute prejudicial error.

_____

[24] *See* Jury Instruction No. 15 (doc. 135 at 18-19) and Judge Vratil's memorandum and order (doc. 66).

D.     Subsequent Remedial Measures

SFX argues the court erred by admitting Exhibit 73a, which is an aerial photograph showing the run-off area at Corner 10.  This photograph was taken after the accident in question and, more to the point, after Heartland Park had removed the concrete carrier outside of Corner 10.  In the photograph, the concrete barrier removed after plaintiff's accident is depicted as a dark line; the other barriers depicted in Exhibit 73a are shown as white lines.

Before trial, consistent with Fed. R. Evid. 407's general proscription against the use of evidence of a defendant's subsequent remedial measures, the court granted defendants' motion in limine to exclude evidence regarding changes that were made to the track after plaintiff's accident; the court so ruled because none of the various exceptions to Rule 407 were applicable, i.e., defendants stipulated Heartland Park had control over the barrier outside of Corner 10 and that it was feasible to move the barrier with the proper equipment (*see* doc. 120 at 13).

During trial, plaintiff moved to admit Exhibit 73a, a post-remedial measures photograph which had been discreetly retouched so as to show the barrier in question. Defendants objected on the basis it did not accurately depict where the barrier was located at the time of the accident and that the jury would believe the barrier was completely removed.  After closely reviewing the revised exhibit, the court overruled defendants' objection, reasoning that the dark line reasonably depicted the barrier outside Corner 10.

The court respectfully disagrees with SFX's assessment of Exhibit 73a.  Plaintiff adequately established the dark line accurately represented the placement of the barrier at the time of the accident.  Further, the court is unpersuaded the dark line, as opposed to a white line, constituted evidence of subsequent remedial measures beyond the scope of the limine ruling.  In this regard, it is important to remember there was no testimony presented to the jury as to when the photograph was taken.  No evidence was presented during trial that defendant had moved the barrier outside Corner 10 after plaintiff's accident; whether in response to the accident or otherwise.  Thus, the admission of Exhibit 73a clearly was not prejudicial error.

E.      Future Medical Expenses

SFX argues the evidence was insufficient to support the jury's award of $213,750 for future medical expenses.  Specifically, SFX contends plaintiff did not present sufficient evidence of the cost of any future medical procedures that plaintiff may undergo.  Plaintiff argues there was ample evidence of the future medical expenses that plaintiff will incur over the rest of his life due to the accident at Heartland Park

The court, as mentioned earlier, has the discretion to grant a new trial if a verdict appears to be against the weight of the evidence.[25]  But as a general rule the court must be mindful not to usurp the role of the jury, and must exercise its discretionary power only in

---

[25] *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir. 1995).

exceptional circumstances where the verdict was clearly against the weight of the evidence.[26] "A new trial is not warranted simply because the court would have reached a different verdict."[27]   A party seeking to set aside a jury verdict, "bear[s] the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence."[28] In considering SFX's motion for new trial, the court must view the evidence in a light most favorable to plaintiff.[29]

It is true plaintiff did not present evidence of the specific amounts of his anticipated future medical expenses.  Nevertheless, the court finds there was sufficient evidence and testimony from which the jury could estimate or infer that plaintiff would incur future medical expenses in the amount of $213,750.  John Woeste, M.D. testified he recommended plaintiff see a neurosurgeon to discuss his options for future surgery on his lower back, such as spine fusion.  Dr. Woeste also described the pain management techniques he has prescribed for plaintiff and indicated plaintiff would continue to need pain management care for the remainder for his life.  Dr. Woeste testified plaintiff is likely to develop post-traumatic arthritis in several of his joints as he ages.

---

[26] *Rivera v. Rivera*, 262 F. Supp. 2d 1217, 1230-31 (D. Kan. 2003) (citation omitted).

[27] *Hillman v. U.S. Postal Serv.*, 169 F. Supp. 2d 1218, 1222 (D. Kan. 2001) (citation omitted); *accord Boyce v. Bd. of County Comm'rs*, 857 F. Supp. 794, 797 (D. Kan. 1994).

[28] *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (internal quotations and citation omitted).

[29] *Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir. 1993).

Dr. Woeste's testimony was buttressed by Todd Northup, M.D., who performed knee surgery on plaintiff in 2005.  In his opinion, plaintiff will have post-traumatic arthritis in his knee, back, hip, and shoulder.  He was expected to perform plaintiff's upcoming shoulder surgery and testified plaintiff would need approximately two to three sessions of physical therapy for the shoulder per week for twelve weeks following the surgery.

Exhibit 98ii is a summary of plaintiff's medical bills from the time of the accident up to 2007.  The total is shown as $881,650.51.  Plaintiff's medical expenses are itemized in Exhibits 98A-I, 98S-U, 98AA-CC, 103, and 106.  The jury was also instructed that plaintiff's remaining life expectancy is 38.2 years.[30]

From all the foregoing evidence, the court finds the jury could properly infer plaintiff would incur $213,750 in future medical expenses over the remainder of his life.  To be sure, given plaintiff's fairly good recovery, a much lower award for future medical expenses also would have been within the evidence.  But the court cannot say the jury's determination that plaintiff was entitled to recover the specified amount was clearly, decidedly, or overwhelmingly against the weight of the evidence.

### V.  SFX's Motion to Alter or Amend the Judgment
### Based on the Kansas Statutory Cap on Noneconomic Damages

SFX's motion to alter or amend the judgment raises two issues: (1) the jury's award of future medical expenses; and (2) application of the Kansas statutory cap on noneconomic damages.  As discussed above, the court finds plaintiff presented sufficient evidence to

---

[30] Doc. 135, Instruction No. 18.

support the award of future medical expenses.  Thus, SFX's motion to alter or amend the judgment as relates to the first issue is denied.

As concerns noneconomic damages, the record reflects the parties' stipulation during the final pretrial conference that the substantive issues in this case are controlled by Kansas law.[31]  Under Kansas law, specifically, K.S.A. § 60-19a02(b), "[i]n any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss *shall not* exceed a sum total of $250,000" (emphasis added).  According to subsection (d) of K.S.A. § 60-19a02, "[i]f the verdict results in an award for noneconomic loss which exceeds the limit of this section, the court *shall* enter judgment for $250,000 for all the party's claims for noneconomic loss" (emphasis added).

Here, the jury awarded plaintiff $264,625 for noneconomic loss to date, $758,150.62 for future noneconomic loss, and $263,380.91 for loss or impairment of services as spouse, for a combined total of $1,286,156.53 in noneconomic loss.  These awards were in addition to $647,875 for past medical expenses, $213,750 for the previously discussed future medical expenses, and $380,086 in future economic loss, for a combined total of $1,241,711 in economic losses.

As a matter of law, the court finds, pursuant to the Kansas statutory cap, the portions of the jury's award for noneconomic loss to date and for future noneconomic loss must be

---

[31] *See* pretrial order (doc. 62 at ¶ 3(d)).

reduced.  That is, the jury's award of such damages in the amount of $1,286,156.53 must be reduced to $250,000.

SFX argues the $263,380.91 award for loss or impairment of services as spouse is subject to the statutory cap.  As discussed in *Wolfgang v. Mid-America Motorsports, Inc.*, 914 F. Supp. 434, 438-39 (D. Kan. 1996), *aff'd* 111 F.3d 1515, 1529 (10th Cir. 1997), this determination depends on whether loss of consortium claims are economic or noneconomic in nature.  Jury Instruction No. 19 (doc. 135 at 24) states as follows:

> If you find for the plaintiff, you may allow a sum which will constitute fair and reasonable compensation for the loss or impairment of plaintiff's ability to perform services as a husband resulting from injury sustained by him.
>
> In arriving at the amount of recovery, you should consider the loss or impairment of plaintiff's ability to perform services in the household and in the discharge of his domestic duties, and the loss or impairment of plaintiff's companionship, aid, assistance, comfort and society.

There was some evidence about the types of household services plaintiff provided before and after his accident.  But there was *no* evidence at trial regarding the monetary value of household services in this case.  Accordingly, the court finds the statutory cap applies to the entire loss of consortium award.[32]

Plaintiff argues SFX did not properly preserve the application of the statutory cap as an affirmative defense in the pretrial order.  Of course, under Fed. R. Civ. P. 16(e), the

---

[32] *See Wolfgang*, 914 F. Supp. at 439 (citing *Fenstermacher v. Telelect, Inc.*, No. 90-2159, 1992 WL 175114, at *13 (D. Kan. July 17, 1992); *Marley v. Chem. Waste Mgmt.*, Inc., No. 91-1487, 1993 WL 390055, at *3 (D. Kan. Sept. 27, 1993)).

pretrial order controls the subsequent course of the case and evidence or legal theories that are not at least implicitly raised in the pretrial order are generally barred at trial unless admitted without objection.[33]   Although SFX did not specifically state in the pretrial order the Kansas statutory cap would apply to any damages awarded by the jury, the court finds SFX did not waive application of the statutory cap.   In the court's view, there was no need to plead the cap as an affirmative defense.   That is, especially given the unambiguous and mandatory language in the applicable Kansas statute about caps on noneconomic damages, and given that the pretrial order recites the parties' stipulation that Kansas substantive law is controlling, the court is wholly unpersuaded by the cases cited by plaintiffs that SFX had to specifically plead the damages cap in the pretrial order.[34]   Nor is the court persuaded that plaintiff got sand-bagged by SFX by making any strategic or tactical decisions in reliance upon the assumption that the cap was inapplicable.[35]

## VI.   Conclusion and Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

---

[33] *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[34] *See, e.g.*, *Bentley v. Cleveland County Board of County Comm'rs*, 41 F.3d 600 (10th Cir. 1994); *Flenory v. Eagle's Nest Apartments*, 28 Kan. App. 2d 906, 22 P.3d 613 (2001).

[35] In his responsive brief, plaintiff argues that there are at least six tactics available to litigants to avoid the effects of Kansas damage caps (doc. 162 at 4-5).   But conspicuously missing from plaintiff's response is any credible evidence (by affidavit or otherwise) that any of these purported tactics actually were considered by his attorneys before or during trial.

1.      SFX's motion for judgment as a matter of law, or in the alternative, for a new trial **(doc. 157)** is denied.

2.      SFX's motion to alter or amend the judgment **(doc. 159)** is granted in part and denied in part.  That is, the motion is granted with regard to the recoverable total amount of noneconomic damages, but the motion is denied with specific regard to the jury's award of future medical expenses.

3.      The Clerk shall file an amended judgment in plaintiff's favor against SFX for $1,491,711, plus the costs of this action.  Plaintiff's claims against Heartland Park shall remain dismissed, with prejudice.

Dated this 27th day of November, 2007, at Kansas City, Kansas.


　s/ James P. O'Hara　　　　　　　
James P. O'Hara
U.S. Magistrate Judge